**In re 7677 EAST BERRY AVENUE ASSOCIATES, L.P., et al., Debtors.**

**Nos. 09–27906, 09–27901, 09–28000.**

United States Bankruptcy Court, D. Colorado.

Nov. 19, 2009.

834

Daniel J. Garfield, Michael J. Pankow, Denver, CO, for Debtors.

## ORDER

MICHAEL E. ROMERO, Bankruptcy Judge.

This matter is before the Court on the *Application to Employ Brownstein Hyatt Farber Schreck, LLP as Counsel for Debtor in Possession* (the "Application")[1] filed by each of the three jointly administered debtors, 7677 East Berry Avenue Associates, L.P. ("7677"), Everest Holdings, LLC ("Everest Holdings"), and EDC Denver I, LLC ("EDC Denver") (collectively, the "Debtors") and the objection to the Application filed by NexBank, SBB ("Nex-Bank"). The Court has considered the pleadings, exhibits, and testimony, as well as the legal arguments presented by the parties, and hereby makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) as it concerns the administration of the estate.

## BACKGROUND FACTS

### A. The Jointly Administered Case

7677, a Delaware limited partnership, develops and operates a luxury residential, retail, and entertainment development in Greenwood Village, Colorado (the "Project"). The Project includes two residential condominium towers, The Landmark

---

1. In compliance with FED. R. BANKR.P. 2014(a), the Application is supported by a Verified Statement of Daniel J. Garfield (the "Verified Statement") and a Supplemental Verified Statement of Daniel J. Garfield (the "Supplemental Verified Statement"). The Court admitted the Verified Statement and Supplemental Verified Statement, Debtors' Exhibits 1 and 11, and treated such statements as Mr. Garfield's testimony, subject to cross-examination.

(which opened in 2004) and The Meridian (which opened in 2007). Neither tower is fully occupied and sales efforts for both towers are ongoing.

EDC Denver is the general partner of 7677 and Everest Holdings is the sole member of EDC Denver. Mr. Zach Davidson ("Davidson") is the manager of both EDC Denver and Everest Holdings. EDC Denver and Everest Holdings are "sole purpose" entities and do not conduct any business other than holding the positions described above relating to the Project.

## B. The Debtors' Debt Structure[2]

### 1. 7677

All of the assets in the jointly administered cases are held by 7677. Schedule A filed in the 7677 case lists the Landmark and Meridian residential real property with a value of $118,869,600.00 and the Landmark retail shops with a value of $36,950,000.00.[3] All of the real property is subject to the secured claim of Hypo Real Estate Capital Corp. ("Hypo") in the amount of $90,662,942.69 and numerous mechanic's liens totaling $3,173,089.14.[4] The total value of the real property is listed as $155,713,000.00, with total secured debt of $100,621,886.15.[5] 7677 also owns

personal property, including cash, utility deposits, retail accounts receivable, a sales tax rebate agreement with the City of Greenwood Village, office equipment and furnishings, and customer deposits.[6] The total value of the personal property is listed as $12,545,722.28.[7]

7677 lists total unsecured debt of $15,673,330.01.[8] NexBank is its largest unsecured creditor, holding a claim in the amount of $11,769,314.02 based on a loan dated March 6, 2008.[9] This debt constitutes approximately seventy-five percent (75%) of the total claims by unsecured creditors. According to Schedule H, filed in each of the Debtors' jointly administered cases, 7677, Everest Holdings, EDC Denver, 7677 Limited Interest Holder, LLC[10] and Davidson are all codebtors on the debt to NexBank.[11] EDC Denver is also a codebtor with 7677 with respect to all creditors of 7677 by virtue of its capacity as general partner of that entity.[12]

### 2. EDC Denver

EDC Denver has no income, no real property and no personal property (other than its general partnership interest in 7677).[13] NexBank is listed as a secured creditor holding two claims, one in the amount of $18,100,000.00[14] and the other

---

**2.** The descriptions which follow with respect to the debts and assets of these debtors (including claims amounts and valuation of real property) are derived from the Debtors' schedules. They are for purposes of this opinion only and are not findings to be used in any other proceeding in connection with the jointly administered bankruptcy cases.

**3.** *Debtors' Exhibit 3,* Schedule A.

**4.** *Id.,* Schedules A and D.

**5.** *Id.*

**6.** *Id.,* Schedule B.

**7.** *Id.*

**8.** *Id.,* Schedule F

**9.** *Id.*

**10.** 7677 Limited Interest Holder, LLC is the limited partner of 7677 and is not a debtor in bankruptcy.

**11.** *Debtors' Exhibits 3, 4, and 5.*

**12.** *Debtors' Exhibits 3 and 4.*

**13.** *Debtors' Exhibit 4.*

**14.** The $18,100,000.00 secured claim is described as, "July 27, 2007 Mezzanine Construction Loan secured by pledge of security

in the amount of $8,000,000.00.[15] EDC Denver's unsecured debt is $116,825,001.35 (including the debts to NexBank and Hypo).

### 3. Everest Holdings

Everest Holdings has no income, no real property and no personal property (other than its 100% membership interest in EDC Denver).[16] NexBank is listed as a secured creditor holding two claims, one in the amount of $18,100,000.00 [17] and the other in the amount of $8,000,000.00.[18] Everest Holdings has no unsecured debt.

### C. Relationship between the Debtors and Everest Marin

Across the street from the Project is a development known as The European Village. The European Village is an asset of Everest Marin, L.P. ("Everest Marin"). EDC Marin I, LLC ("EDC Marin") is the general partner of Everest Marin. The European Village is managed on a day-to-day basis by Everest Development Company ("Everest Development"), whose chief executive officer is Davidson. Everest Marin, EDC Marin and Everest Development are not in bankruptcy.

BHFS described the relationship between the Project and The European Village as follows:

[7677's] primary assets are the planned communities known as the Landmark and Meridian Tower Residences ("Landmark"). Everest Marin's primary assets are the European Village Brownstones and Manor Homes ("European Village"). The Landmark and European Village are related developments and have entered into various agreements with respect to operation and development of the properties, sales of residences, and the lease of retail and other space. BHFS has been primary counsel with respect to the two developments, including financing and related litigation, and is familiar with [7677's] business and Everest Marin's business. Post-petition, BHFS will continue to represent Everest Marin and EDC Marin, LLC, (except in respect of Everest Marin's claims or other relationships with the Debtor).[19]

### D. Nexbank Objection

NexBank objects to BHFS being employed as counsel for all three Debtors, arguing the multiple representation goes against Tenth Circuit case law.[20] As set

---

interest in Ownership Interests as described in that certain Assignment, Pledge and Security Agreement." *Debtors' Exhibit 4*, Schedule D.

15. The secured $8,000,000.00 secured claim is described as "March 6, 2008 pledges security interest in Ownership Interests as described in that certain Subordinate Assignment, Pledge and Security Agreement." *Debtors' Exhibit 4*, Schedule D.

16. *Debtors' Exhibit 5*.

17. The $18,100,000.00 secured claim is described as, "July 27, 2007 pledge of security interest of Ownership Interests as described in that certain Assignment, Pledge and Secu-

rity Agreement." *Debtors' Exhibit 5*, Schedule D.

18. The secured $8,000,000.00 secured claim is described as "March 6, 2008 Pledge of security interest of Ownership Interests as described in that certain Subordinate Assignment, Pledge and Security Agreement." *Debtors' Exhibit 5*, Schedule D.

19. *Verified Statement*, ¶ 8.

20. *In re Interstate Distribution Center Associates, Ltd.*, 137 B.R. 826 (Bankr.D.Colo.1992), *In re TMA Associates, Ltd.*, 129 B.R. 643 (Bankr.D.Colo.1991), and *In re Royal Gorge Associates*, 77 B.R. 277 (Bankr.D.Colo.1987).

forth in more detail below, NexBank also objects to BHFS's transfer of its $662,843.93 pre-petition claim for legal fees incurred by 7677 to Everest Marin in exchange for a Promissory Note and Deed of Trust. This transfer, argues NexBank, merely switches BHFS from being a direct creditor to being an indirect creditor (a creditor of a creditor). NexBank contends the appropriate course of action would have been for BHFS to waive the pre-petition claim or simply not to serve as Debtors' counsel. NexBank suggests it is unclear or unknown whether the Debtors may have claims against Everest Marin, which confusion is compounded by the fact that BHFS will continue to represent Everest Marin (in matters unrelated to the bankruptcy) and that Everest Marin's real estate development is related to the Debtors' real estate development. NexBank also questions whether certain pre-petition payments totaling approximately $170,000.00 from 7677 to BHFS constitute avoidable preferences. Further, NexBank raised concerns regarding BHFS's prior representation of several creditors in this case, including Everest Marin, Rike Palese and CB Richard Ellis, Inc. ("CBRE"). Based on the above stated facts, NexBank asserts BHFS has not shown it is qualified to serve as Debtors' counsel under 11 U.S.C. § 327.[21]

## DISCUSSION

■ An important preliminary comment is necessary in this case. This Court is not implying it has any concern regarding the quality of services provided by BHFS. At the time of the hearing in this matter, the Debtors were just thirty days into this case and much had already been accomplished, to the credit of BHFS. Accomplishments, however, cannot wash a professional clean of any adverse interest or make an otherwise interested person disinterested. Thus, the Court's discussion below is not affected by, nor is it a reflection upon, the services rendered thus far.

## A. Statutory Requirements for Employment–Section 327

■ "An analysis of the issue of employment of bankruptcy counsel must begin with the premise that debtors should be free to select counsel of their choice. However, '[t]his general principal [*sic*] is tempered by ethical restraints placed upon attorneys by the Rules and the Code. It is also modified and controlled by statutory restrictions contained in the Bankruptcy Code which prohibit the attorney from representing an interest materially adverse to the estate.'" [22] "A bankruptcy court has the authority and the responsibility to only approve employment of professionals who meet the minimum requirements set forth in § 327(a), independent of objections.... An applicant under § 327(a) has the burden of establishing by application and accompanying affidavit that its chosen professional is qualified." [23]

■ Section 327 states in relevant part: (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, **that do not hold or represent an interest**

---

**21.** Unless otherwise noted, all future statutory references in the text are to title 11 of the United States Code.

**22.** *In re TMA Associates, Ltd.,* 129 B.R. at 645 (citing *Vanderbilt Associates, Ltd.,* 111 B.R. 347, 351 (Bankr.D.Utah 1990)).

**23.** *In re Interwest Business Equipment, Inc.,* 23 F.3d 311, 317–318 (10th Cir.1994) (citation omitted).

adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.[24]

Subsection (a) thus sets forth two requirements: (1) counsel must "not hold or represent an interest adverse to the estate" and (2) must be a "disinterested person." [25] "Together, the statutory requirements of disinterestedness and no interest adverse to the estate 'serve the important policy of ensuring that all professionals appointed pursuant to section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.' " [26]

Code sections 327(c),[27] 327(e),[28] and 1107(b) [29] contain limited exceptions to the general rule set forth in § 327(a).[30] The discussion below focuses on the two requirements in § 327(a), including the exceptions where relevant. These two requirements will be discussed separately, although "[t]here is, indisputably, some overlap between the section 327(a) standard and section 101(14)(E) disinterest requirement." [31] The overlap has been described as follows:

> It is well-recognized that the meaning of the phrase "interest materially adverse" in the definition of a disinterested person overlaps with that of "interest adverse" in the first prong of § 327(a) and, together, they form one hallmark with which to evaluate whether professionals seeking court-approved retention (or to remain retained by the estate) meet the absence of adversity requirements embodied in the Bankruptcy Code.[32]

### 1. Section 327(a)—"Hold or Represent an Interest Adverse to the Estate"

The phrase "hold or represent an interest adverse to the estate" is not defined in the Bankruptcy Code. The bankruptcy court for the District of Utah broke down this phrase and set forth its own definitions of "hold an interest adverse to the estate," and "represent an adverse inter-

---

24. 11 U.S.C. § 327 (emphasis added). *See also In re Martin*, 817 F.2d 175, 177 n. 1 (1st Cir.1987) ("Although § 327(a), by its terms, speaks of representing 'the trustee,' § 1107(a) (1978) makes § 327(a) applicable to attorneys appointed to assist chapter 11 debtors in possession.").

25. *In re Cook*, 223 B.R. 782, 789 (10th Cir. BAP 1998).

26. *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998) (*quoting Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir.1994)).

27. Subsection 327(c) provides: "In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest."

28. Subsection 327(e) provides: "The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed."

29. Subsection 1107(b) provides: "Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case."

30. *In re Crivello*, 134 F.3d at 835.

31. *In re BH & P, Inc.*, 949 F.2d 1300, 1314 (3rd Cir.1991) (citations omitted).

32. *In re Vebeliunas*, 231 B.R. 181, 189 (Bankr.S.D.N.Y.1999) (citations omitted).

est."[33] *Roberts* defined "hold an interest adverse to the estate" as follows:

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.[34]

*Roberts* defined "represent an adverse interest" as "to serve as agent or attorney for any individual or entity holding such an adverse interest."[35] Courts in this Circuit have adopted the *Roberts* definitions, as have numerous other courts.[36]

In addition, the Second Circuit Court of Appeals pointed out the language of § 327(a) is in the present tense and noted " 'Congress' use of a verb tense is significant in construing statutes.' "[37] The Second Circuit concluded "counsel will be disqualified under section 327(a) only if it presently 'hold[s] or represent[s] an interest adverse to the estate,' notwithstanding any interests it may have held or represented in the past."[38]

While it is not bound by this precedent, this Court agrees with the Second Circuit's conclusion. Thus the Court must consider whether counsel **presently** "holds" or "represents" interests adverse to the estate, including scrutinizing BHFS's pre-petition debt and representation of related entities and creditors in this case. In this regard, the bankruptcy court for the Northern District of Oklahoma has stated,

> In determining whether a professional has or represents an "adverse interest," one court observed: "[I]f it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate." *In re The Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr.S.D.N.Y. 1994). An actual conflict exists if there is "an active competition between two interests, in which one interest can only be served at the expense of the other." *In re BH & P, Inc.*, 103 B.R. 556, 563

---

**33.** *In re Roberts*, 46 B.R. 815, 826–827 (Bankr.D.Utah 1985), *aff'd in part and rev'd in part on other grounds*, 75 B.R. 402 (D.Utah 1987) (en banc).

**34.** *Id.*, at 827.

**35.** *Id.*, at 827.

**36.** *See In re AroChem. Corp.*, 176 F.3d 610, 623 (2nd Cir.1999); *In re Crivello*, 134 F.3d at 835; *In re Harwell*, 2008 WL 239559, *3 (D.Colo. January 25, 2008) (not reported in F.Supp.2d); and *In re Cook*, 223 B.R. at 789.

**37.** *In re AroChem Corp.*, 176 F.3d at 623 (quoting *United States v. Wilson*, 503 U.S. 329, 333, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992)).

**38.** *Id.*, at 623. As support for its position, the Court in *AroChem Corp.* noted other sections of the Bankruptcy Code wherein a distinction is made between past and present representation:

> For example, the Bankruptcy Code defines a "disinterested person" as a person that, among other things, *"is not and was not* an investment banker for any outstanding security of the debtor," *see* 11 U.S.C. § 101(14)(B) (emphasis added); *"has not been, within three years before the date of* the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor," *id.* § 101(14)(C) (emphasis added); and *"is not and was not, within two years before the date of the filing of the petition*, a director, officer, or employee of the debtor," *id.* § 101(14)(D) (emphasis added).

*Id*, at 623–624. Although subsection (B)'s language has since been removed from the statute, the *AroChem* Court's reasoning remains sound.

(Bankr.D.N.J.1989), *aff'd in pertinent part*, 119 B.R. 35 (D.N.J.1990). "As a general principle, professional persons employed by the trustee should be free of any conflicting interest which might, in the view of the trustee or the bankruptcy court, affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them during the administration of a case." *In re Amdura Corp.*, 121 B.R. 862, 865 (Bankr. D.Colo.1990), *quoting* Collier on Bankruptcy ¶ 327.03 (1985).[39]

*2. Section 327(a)—"Disinterested Person"*

The term "disinterested person" is defined in the Bankruptcy Code as one who:

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.[40]

The Second Circuit found the "disinterested" requirement implicates "only the personal interests" of the professional in question, requiring the professional actually to "have" such an interest.[41] Further:

If "to have" and "to represent" were identical considerations, the trustee never could hire counsel to bring claims against a class of creditors because, once retained, such counsel would "represent," and therefore "have," an interest materially adverse to the interest of a class of creditors, *i.e.*, the estate's interests against the creditors. The anomalous result would be that all such counsel automatically would be "interested" and thus disqualified.[42]

■ In addition, § 101(14) provides not only may disinterestedness be defeated by an interest materially adverse for one of the specific reasons delineated in the statute, but also "for any other reason."[43] Therefore, former subsection (E), now subsection (C), "commonly referred to as the 'catch-all clause,' is broad enough to exclude an attorney with some interest or relationship that 'would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules.' "[44] Federal Rule of Bankruptcy Procedure 2014 adds a disclosure requirement to enforce § 327's disinterestedness standard.[45]

Finally, while it is not directly on point with the facts of this case, the decision in *In re EZ Links Golf, LLC* contains a

---

**39.** *In re Git–N–Go, Inc.*, 321 B.R. 54, 58–59 (Bankr.N.D.Okla.2004).

**40.** 11 U.S.C. § 101(14). In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 § 414, Pub.L. No. 109–8, 119 Stat. 23, 107, Congress amended and recodified 11 U.S.C. § 101(14)(E) as 11 U.S.C. § 101(14)(C) to eliminate the section's applicability to investment banks. *See In re Lincoln Hosp. Medical Center, Inc.* 234 Fed.Appx. 426, 428, 2007 WL 1170924, *1 (9th Cir. 2007).

**41.** *In re AroChem Corp.*, 176 F.3d at 629 (*citing In re BH & P*, 949 F.2d at 1310 n. 12).

**42.** *Id.*

**43.** *See In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3rd Cir.1998).

**44.** *In re Cook*, 223 B.R. at 789 (*citing In re BH & P Inc.*, 949 F.2d at 1309) (*in turn quoting Roberts*, 46 B.R. at 828 n. 26).

**45.** *Id.*, at 790.

helpful discussion of payment of an attorney's retainer by a third party in the context of the "disinterestedness" requirement:

As for the payment of a retainer by a third party, the majority of courts do not find that it is a *per se* rule for disqualification or to deem the professional not disinterested. E.g., *In re Rabex Amuru of North Carolina, Inc.*, 198 B.R. 892 (Bankr.M.D.N.C.1996); *In re Lotus Properties LP*, 200 B.R. 388 (Bankr.C.D.Cal.1996). "Instead, disinterestedness in this context depends upon the identity and status of the payor, the relationship of the payor to the debtor and to other parties in interest and the circumstances surrounding the payment of the retainer." *Rabex* at 896. The court in the *Lotus Properties* case adopted a five part test set forth in *In re Kelton*, 109 B.R. 641, 658 (Bankr.D.Vt. 1989). The test to serve as counsel who has received payments from the debtor's insiders requires:

(1) the arrangement must be fully disclosed to the debtor/client and the third party payor/insider;

(2) the debtor must expressly consent to the arrangement;

(3) the third party payor/insider must retain independent legal counsel and must understand that the attorney's duty of undivided loyalty is owed exclusively to the debtor/client;

(4) the factual and legal relationship between the third party payor/insider, the debtor, the respective attorneys, and their contractual arrangement concerning the fees, must be fully disclosed to the Court at the outset of the debtor's bankruptcy representation;

(5) the debtor's attorney/applicant must demonstrate and represent to the Court's satisfaction the absence of facts which would otherwise create non-disinterestedness, actual conflict, or impermissible potential for a conflict of interest.

■ *Id.* at 393.[46] As can be seen from the discussion of the relevant case law above, there is no bright line or per se rule this Court can use regarding the two requirements in § 327(a). The propriety of employment under § 327 must be examined on a case by case basis.[47]

### 3. Section 327(a) and (c)—"Actual Conflict"

■ Although counsel may have "represented an interest adverse to the estate" within the meaning of § 327(a), § 327(c) provides one of the above-mentioned limited exceptions by stating an attorney will not be disqualified based solely on prior representation of a creditor, unless there is an **actual conflict,** in which case disqualification is mandatory.[48] Under this provision, the existence of inter-debtor claims does not create a *per se* prohibition of counsel representing both estates.[49] However, the Bankruptcy Appellate Panel for the Tenth Circuit has noted:

Subsection (c) addresses the situation where dual representation of the trustee, or debtor in possession, and a creditor is the sole reason advanced for disqualification and the professional is otherwise qualified; it does not end all inquiry simply because [the attorney]

---

46. *In re EZ Links Golf, LLC,* 317 B.R. 858, 863 (Bankr.D.Colo.2004).

47. *See AroChem Corp.,* 176F.3d at 623; *Matter of Carter,* 116 B.R. 123, 127 (E.D.Wis.1990).

48. 11 U.S.C. § 327(c). *See AroChem Corp.* 176 F.3d at 624.

49. *See In re BH & P, Inc.,* 949 F.2d at 1314.

represented both the Trustee and [the creditor].[50]

In addition, the Tenth Circuit has stated:

> Although it is not a model of clarity, subsection (c) as it is currently worded is intended to allow joint representation of a trustee and of a creditor of the estate, if there is no apparent conflict of interest. Even then, if another creditor or the U.S. trustee objects, the bankruptcy judge can disqualify a professional *solely* on the basis of simultaneous representation, *if* it finds the joint representation creates an actual conflict.[51]

The Code does not define the term "actual conflict of interest," and courts have addressed the issue on a case by case basis, and have been given discretion in deciding whether an actual conflict exists.[52] The Bankruptcy Court for the Northern District of Oklahoma adopted the reasoning of the bankruptcy court in the *BH & P, Inc.* case, concluding an actual conflict exists where there is "an active competition between two interests, in which one interest can only be served at the expense of the other."[53]

## B. Non–Statutory Guidance—"The Appearance of Impropriety"

In addition to the specific guidelines set forth in §§ 327 and 101(14), courts considering whether attorneys may be employed by a bankruptcy estate have evaluated other factors. Although courts have used a variety of descriptions for those factors not delineated in the Code, such factors may be generalized as the avoidance of "the appearance of impropriety."

Disallowing employment due to the "appearance of impropriety" stems from language contained in Canon 9 of the Model Code of Professional Responsibility formerly promulgated by the American Bar Association. Canon 9 required attorneys to "avoid even the appearance of impropriety." The ABA Model Code has since been replaced by the ABA Rules of Professional Conduct, which expressly eliminated the "appearance of impropriety" standard.[54] However, courts have continued to use the term and the concept in determining whether attorneys should be employed in bankruptcy cases.[55] Moreover, some courts have looked to state law ethics rules in examining attorney applications, although such rules are not definitive.[56][57]

**50.** *In re Cook*, 223 B.R. at 790.

**51.** *Interwest Business Equipment, Inc.*, 23 F.3d at 316.

**52.** *In re BH & P, Inc.*, 949 F.2d at 1315 *(citing In re Star Broadcasting, Inc.*, 81 B.R. 835, 844 (Bankr.D.N.J.1988); *In re Hoffman*, 53 B.R. 564, 566 (Bankr.W.D.Ark.1985)).

**53.** *In re Git–N–Go, Inc.*, 321 B.R. at 58 *(quoting In re BH & P, Inc.*, 103 B.R. 556, 563 (Bankr.D.N.J.1989)), *aff'd* in pertinent part, 119 B.R. 35 (D.N.J.1990).

**54.** See ABA Rule 1.9, comment [5].

**55.** *See In re Filene's Basement, Inc.*, 239 B.R. 850, 857 (Bankr.D.Mass.1999); *In re Granite Partners, L.P.*, 219 B.R. 22, 34 (Bankr. S.D.N.Y.1998).

**56.** *See In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985) (A state code of professional responsibility did not by its own terms apply to attorney sanctions in the federal courts, but a federal court, in exercising its inherent power under the standards imposed by federal law, may charge attorneys with the knowledge of, and conformity to, state codes); *see also U.S. Trustee v. S.S. Retail Stores Corp. (In re S.S. Retail Stores Corp.)*, 211 B.R. 699, 703 (9th Cir. BAP1997) (Although California law provides for a waiver of a conflict, the Bankruptcy Code does not allow for such waiver under §§ 101(14) or 327(a)).

**57.** While there is no Colorado authority employing this approach, for informational purposes it should be noted the current Colorado Code of Professional Conduct does not con-

Application of this concept has varied in courts throughout the country. The Third Circuit Court of Appeals has held the appearance of impropriety alone does not justify disqualification of counsel.[58] Other courts, however, have taken a more strict approach.[59] On the other end of the spectrum, federal courts in California have found the appearance of impropriety concept to be of little or no import when examining employment issues.[60]

In the Tenth Circuit, although the Bankruptcy Appellate Panel did not expand on what is meant by the appearance of impropriety, it did note, "[w]hile representation of a creditor is not a *per se* bar to employment by the trustee under § 327(c), an actual conflict of interest or the appearance of impropriety remain as independent grounds for disqualification."[61] The *Cook* Court also concluded a potential conflict could form the basis for disqualification.[62] Similarly, another division of this Court has noted "the opportunity for at least the appearance of impropriety is greatly multiplied when the attorney is also representing an individual and an interested corporate entity who are the guarantors for the debtor's primary secured debt."[63]

 "The Tenth Circuit recognizes that bankruptcy courts have broad discretion and power to ensure that professionals are disinterested and do not represent interests adverse to the estate, and recog-

---

tain a requirement to avoid the appearance of impropriety. *See* Colo. R. Prof Con. 1.8.

**58.** The Court in *In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir.2002) found

(1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion-pursuant to § 327(a) and consistent with § 327(c)-disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone ... [U]nder section 327(a) the court could disqualify counsel "only if it had an actual or potential conflict of interest." *(citing In re Marvel Entertainment Group,* 140 F.3d at 476.)

*See also In re Marvel Entertainment Group,* 140 F.3d at 477 (While § 327(a) and (c) require disqualification if an attorney has an actual conflict, and allow disqualification if an attorney has a potential conflict, a court may not disqualify an attorney based solely on the appearance of a conflict.) Thus only an actual or potential conflict allow a court to prohibit an attorney's employment under § 327.

**59.** *See, e.g., In re Martin,* 817 F.2d at 180–81 (stating the inquiry is whether there exists "either a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors-an incentive sufficient to place those parties at more than acceptable risk-or the reasonable perception of one"); *Matter of Sauer,* 191 B.R. 402, 408 (Bankr. D.Neb.1995) (citations omitted) ("Even the potential for conflict or the mere appearance of impropriety may constitute a disqualifying conflict of interest."); *Matter of Codesco, Inc.,* 18 B.R. at 999–1000 (a disinterested person "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters ... There should be neither an opportunity for the exercise of conflicting interests, or the appearance that dual loyalty may exist.").

**60.** *See In re Wheatfield Business Park LLC,* 286 B.R. 412, 421 (Bankr.S.D.Cal.2002); *In re McKinney Ranch Associates,* 62 B.R. 249, 257 (Bankr.C.D.Cal.1986) (holding avoiding the appearance of impropriety was not part of § 327, but rather imported from state rules which have now disappeared). *See also In re Keravision, Inc.,* 273 B.R. 614, 619 (N.D.Cal. 2002) (holding a "law firm is not *per se* disqualified from employment by a debtor solely because one of its partners was an officer of the debtor.").

**61.** *In re Cook,* 223 B.R. at 789 (*citing* 1 Collier on Bankruptcy ¶ 327.04[7][b] (Lawrence P. King, ed., 15th ed. rev.1998)).

**62.** *Id.,* at 793.

**63.** *In re Sixth Avenue Car Care Center,* 81 B.R. 628, 631 (Bankr.D.Colo.1988).

nizes that potential conflicts are a sufficient basis for disqualifying them." [64] Thus, while avoidance of the appearance of impropriety should be a component of evaluating the employment of counsel, a bankruptcy court must use its discretion to determine whether such an appearance is fatal.[65]

In exercising its discretion on this issue, the Court recognizes it is possible in countless cases an attorney could hold some relationship which could be seen as creating such an appearance of impropriety. For example, it could be argued if an attorney or a member of his firm held a personal account at a creditor bank, an appearance of impropriety existed. Such an interpretation would lead to absurd and damaging results, because some *de minimis* or tangential relationship could disqualify nearly any attorney in any case. At the other end of the spectrum, and indeed closer in nature to the case at bar, lies the situation where substantial or unclear relationships between parties, unorthodox payments, or other significant factors create a genuine appearance of impropriety, casting a pall over the integrity of the bankruptcy system. It is this Court's job to find the balance point between the two extremes.

■■■ Thus, this Court does not adopt any *per se* rule that *any* appearance of impropriety is a bar to employment, but must examine the particular circumstances of each case. In the case at bar, therefore, this Court must evaluate the evidence presented to determine whether all the facts presented create an "appearance of impropriety" sufficient to prevent the attorneys' employment.

## C. Application of the Statutory Law to the Facts in These Cases

### 1. Multiple representation of the three Debtors

■■■ Steven C. Demby ("Demby"), a member of BHFS's real estate practice group, testified BHFS started representing the Debtors in the middle of 2006. At that time, the Debtors were also working with the law firm of Isaacson Rosenbaum, P.C. ("Isaacson"). Mr. Demby testified BHFS has done extensive work for the Debtors in regard to the Project, including (1) the Hypo Real Estate loan transaction, (2) municipal finance, (3) tax incremental financing ("TIF"), (4) master, residential and retail declarations, and (5) contracts and disputes with potential buyers. Isaacson has continued to do the leasing work for the Debtors and is employed as special counsel in this case pursuant to § 327(e).

There is no evidence of intercompany transfers, fraudulent transfers or other causes of action among these three Debtors. As noted above, under the Debtors' debt structure, 7677 holds all debts, with EDC Denver and Everest Holdings liable as codebtors on the debt to NexBank and liable on other debts, based on EDC Denver's position as general partner of 7677 and Everest Holdings' position as the sole member of EDC Denver. Likewise, 7677

---

64. *In re Cook,* 223 B.R. at 791 *(citing In re Interwest Business Equip., Inc.,* 23 F.3d at 316–318).

65. Also instructive is the analysis of the United States District Court for the Southern District of Ohio, which stated:

Congress clearly intended that prior representation could not *per se* sustain a claim of "appearance of impropriety" because it re-

quired a case by case adjudication of the premises underlying objections on such bases. 11 U.S.C. § 327(c). What is required is a factual analysis to determine whether a "threshold quantum" of evidence really creates such an appearance....

*In re Lee Way Holding Co.,* 102 B.R. 616, 622 (S.D.Ohio 1988) (addressing § 327(c)).

holds all the Debtors' assets. EDC Denver and Everest Holdings have no income, no real property and no personal property. Thus, in connection with its representation of all three of these Debtors, such representation does not create an interest adverse to the estate and BHFS is disinterested.

### 2. Representation of other related entities

BHFS admits "[f]rom time to time in matters wholly unrelated to the Debtor, its affiliates or their bankruptcy cases, attorneys with BHFS have represented entities that are creditors or affiliates of creditors of the Debtor and its affiliates ..."[66] Specifically, BHFS performed legal services pre-petition to the following: 7677, EDC Denver, Everest Holdings, 7677 Limited Interest Holder, LLC, Everest Marin, EDC Marin and Davidson.[67]

There is an obvious danger to a firm which represents numerous entities which may participate to some extent or another in a bankruptcy case. The key analysis, however, is whether the past (or present) representation creates a conflict to the duty of loyalty the applicant firm owes to the debtor in the bankruptcy case in which it seeks retention.[68]

BHFS has represented it will not participate in any matter in which any of the Debtors or any entity related to them may be adverse to one another. Further, with respect to those entities which may be considered under bankruptcy or state law as an "affiliate" of any of the Debtors, BHFS prepared an "Acknowledgment of

duty of loyalty" letter wherein those entities acknowledged BHFS's duty of loyalty is solely to 7677 in respect of matters including both 7677 and such related entity.[69] The letter also advises the related entities they must retain independent counsel if they desire legal representation with respect to any issue involving 7677. The entities executing the acknowledgment letters are: (1) Everest Marin, (2) EDC Marin, (3) 5500 Greenwood Plaza Boulevard, # 230, (4) Everest Construction Company, LLC, (5) Everest Management Company, LLC, (6) Everest Design Group, LLC, and (7) 7677 Limited Interest Holder, LLC.[70] Davidson, acting as Manager of each of these seven entities, signed the acknowledgment letters on September 18, 2009. Davidson declined to obtain independent counsel for the entities prior to signing the letters.

Notwithstanding these representations, NexBank also contends BHFS cannot meet the requirements in § 327(a) because the Landmark and Meridian towers are competitors with the European Village. The Landmark and The Meridian are across the street from the European Village and they share sales and marketing efforts. The homeowners of the European Village will be able to take advantage of the amenities at The Landmark and The Meridian. However, BHFS argues the two are not competitors because they are different types of residences at different price points (i.e. the average price for units at The Landmark and The Meridian is $800,000 while the average price for units at the European Village is $1,000,000). BHFS admitted there is a synergy be-

---

66. Application, ¶ 8.

67. *Verified Statement,* ¶ 6.

68. *See In re Git–N–Go, Inc.,* 321 B.R. at 58–59.

69. These letters appear to be an attempt to address one of the requirements as outlined in cases such as *In re EZ Links Golf, LLC,* 317 B.R. at 863, and *In re Lotus Properties LP,* 200 B.R. 388.

70. *Debtors' Exhibit 9.*

tween the two, but there is no financial relationship between them. Further, the European Village has not broken ground yet. Under these circumstances, the Court believes any concerns regarding competition are speculative at this time.

After considering evidence presented on the scope of the past and current representation of the related entities mentioned above, the Court finds BHFS does not hold or represent an interest adverse to the estate and BHFS is disinterested because no actual or potential conflicts, as defined above, currently exist. However, as discussed below, continued representation of any of these entities post-petition, particularly BHFS's continued representation of Everest Marin (now a creditor in the case), may create the appearance of impropriety.[71]

### 3. Representation of Davidson

 Davidson is the manager of debtor EDC Denver and debtor Everest Holdings. He is also the manager of all seven related entities mentioned above. He is most certainly the person in control of The Landmark, The Meridian and the European Village properties. BHFS previously represented Davidson individually, but will no longer represent Davidson post-petition.[72] There was no evidence as to whether Davidson, individually, signed an acknowledgment or consent letter, however Davidson's testimony was consistent with these letters in that he acknowledged BHFS does not currently represent him.

Davidson has not retained independent legal counsel to represent him in these bankruptcy cases. However, because BHFS's prior representation of Davidson was relatively minor and BHFS will not represent him post-petition, the Court finds BHFS does not hold or represent an interest adverse to the estate and BHFS is disinterested.

### 4. Representation of Creditors

### a. Rike Palese

 Mr. Palese is a real estate associate with 7677's listing agent Taylor Max, LLC. Both Taylor Max, LLC and Rike Palese are listed on 7677's Schedule F with a claim of $286,746.66 for unreimbursed marketing costs.[73] Mr. Palese is further listed on 7677's Schedule G as holding a "residential Condominium Real Estate Contract."[74] At the time the Verified Statement was filed, BHFS represented all of the defendants in a Denver District Court lawsuit captioned *Yabrove v. 7677 East Berry Avenue Associates, L.P., Zach Davidson, and Rike Palese.*[75] At the time of the hearing on October 8, 2009, the *Yabrove* law suit had been dismissed without prejudice, subject to the plaintiffs being allowed to file an arbitration proceeding against the same parties. BHFS stated they will not represent Mr. Palese in connection with any arbitration or on any other post-petition matter.[76] Garfield testified BHFS would advise the Debtors

---

71. *In re Sixth Avenue Car Care Center,* 81 B.R. at 631.

72. *Verified Statement,* ¶ 6.

73. *Debtors' Exhibit 3.*

74. *Debtors' Exhibit 3.*

75. *NexBank's Exhibit B.* The Complaint includes the following claims for relief: (1) Breach of Contract—The Limited Partnership and Davidson, (2) Misrepresentation—All Defendants, (3) Unconscionable Contract—The Limited Partnership and Davidson, (4) Request for Recission of Contract—The Limited Partnership, and (5) Colorado Consumer Protection Act, C.R.S. § 6–1–101 *et seq.*—All Defendants.

76. *Verified Statement,* ¶ 10.

with respect to Mr. Palese's contract listed on Schedule G.

### b. CB Richard Ellis, Inc.

CB Richard Ellis, Inc. ("CBRE"), the Debtors' former appraiser, is listed in 7677's Schedule F with a debt of $7.23 for "trade debt" and $7,500.00 for a "retail management fee" and CBRE Technical Services, LLC is listed in 7677's Schedule F with a debt of $626.10 for "trade debt." [77] CBRE is also listed on 7677's Schedule G with a "Retail Management Agreement." [78] BHFS disclosed it currently represents CBRE in matters unrelated to the Debtors.[79] Garfield testified BHFS will advise the Debtor with respect to CBRE's agreement listed on Schedule G.

### c. Other Creditors

BHFS also disclosed in the Verified Statement that it:

a) currently represents CB Richard Ellis, Inc., D.H. Ruggles & Associates, P.C., Denver Newspaper Agency, and Xcel Energy (or affiliates of the foregoing), which are unsecured creditors of the Debtor, in matters unrelated to the Debtor; b) has represented in the past Marin Metropolitan District, RPI, Red Cafe, LLC, Arapahoe County, David Hicks & Lampert Brokerage, Inc. (or affiliates of the foregoing), which are unsecured creditors of the Debtor, in matters unrelated to the Debtor; c) has represented in the past FirsTier Bank, a secured creditor of the Debtor, in matters unrelated to the Debtor; d) has represented Highland Capital Real Es-

tate Fund 2002–A, L.P. (or an affiliate thereof), which is an unsecured creditor of the Debtor which holds a limited partnership interest in the limited partner of the Debtor, in matters unrelated to the Debtor; and e) has represented Morris Ginsburg (or affiliates of Mr. Ginsburg) and Sonal Patel (or affiliates of Mr. Patel), who are each counterparties to contracts with the Debtor to purchase a residence at the Landmark, in matters unrelated to the Debtor. Additionally, Gary Agron, who is a counterparty to a contract with the Debtor to purchase a residence at the Landmark, is the father of Adam J. Agron, a shareholder of BHFS.[80]

In the Supplemental Verified Statement, BHFS added that it "currently represents, in matters unrelated to the Debtors, General Electric Capital Corporation and Qwest, which are unsecured creditors of 7677, and has represented in the past Sprint, which is an unsecured creditor of 7677." [81]

As noted, although counsel may have "represented an interest adverse to the estate" within the meaning of § 327(a), § 327(c) provides a limited exception by stating an attorney will not be disqualified based solely on prior representation of a creditor, unless there is an **actual conflict,** in which case disqualification is mandatory.[82] With respect to the creditors mentioned above (Palese, CBRE and others), the evidence did not reveal an actual conflict of interest exists based on BHFS's prior representation. BHFS stated they will not represent Mr. Palese post-petition and will only represent CBRE and other

---

**77.** *Debtors' Exhibit 3.*

**78.** *Debtors' Exhibit 3.*

**79.** *Verified Statement,* ¶ 11.

**80.** *Verified Statement,* ¶ 11.

**81.** *Supplemental Verified Statement,* ¶ 8.

**82.** 11 U.S.C. § 327(c). *See AroChem Corp.* 176 F.3d at 624.

unsecured creditors post-petition on matters wholly unrelated to the Debtors thus avoiding an actual conflict. Therefore, there does not appear to be "an active competition between two interests, in which one interest can only be served at the expense of the other." [83] With respect to Palese, CBRE and these other creditors, the Court finds BHFS does not hold or represent an interest adverse to the estate and BHFS is disinterested.

### 5. Potential Avoidance Actions

■ In the Verified Statement, the following pre-petition payments were disclosed:

> BHFS received from [7677] $20,000.00 on August 12, 2009, $125,000 on August 20, 2009, and approximately $26,000 on August 28, 2009, for ongoing work related solely to [7677]. BHFS is netting out fees and expenses for prepetition work and will supplement this statement upon completion of such calculations. BHFS intends to seek court approval of unpaid fees and expenses incurred during the 10 days prior to the Petition Date, consistent with applicable law. BHFS intends to seek approval of a retainer in accordance with applicable law and procedure. [84]

In the Supplemental Verified Statement, the disclosure was modified as follows:

> BHFS received $26,431.01 on August 28, 2009, such that BHFS received a total of $171,431.01 from August 12 through August 28, 2009, for work performed prepetition and for a retainer. BHFS billed [7677] $129,292.39 for work performed in July and August 2009. As a result, as of the Petition Date, BHFS

held a retainer of $41,695.97. Post-petition, BHFS provided $15,000 of that retainer to PGP Valuation, Inc. ("PGP"), 7677's appraiser as part of a $24,000 retainer; 7677 filed a motion to approve PGP's retainer, which motion is pending. BHFS now holds a retainer of 26,695.97. 7677 intends to file a motion to approve BHFS's retainer in the near future. [85]

NexBank argues these pre-petition payments from 7677 to BHFS may constitute preferences. The Debtor contends it is solvent and therefore preference actions would not be appropriate under § 547. Based on the record as it presently exists, a successful preference action against BHFS appears questionable. However, this is an observation and not a finding. Unlike the situation detailed in the case of *In re Pillowtex, Inc.*, herein, NexBank failed to show "a facially plausible claim of a substantial preference." [86] For purposes of this Order, the general allegations of possible preferences are not enough to prohibit BHFS's employment.

NexBank also suggested there may be other transactions with Davidson individually wherein BHFS would have to investigate for potential avoidance actions. The potential avoidance action against Everest Marin was raised in response to the Debtors' disclosure that 7677 made payments to Everest Marin totaling $216,000.00 in the 90 days prior to the bankruptcy petition. [87] In testimony before this Court, Daniel Garfield of BHFS affirmatively indicated the firm would investigate **all** preferences, or would hire special counsel to conduct such a review if affiliates, etc., are involved. This representation, as well as the

---

83. *In re Git–N–Go, Inc.*, 321 B.R. at 58 (*quoting In re BH & P, Inc.*, 103 B.R. at 563).

84. *Verified Statement*, ¶ 13.

85. *Supplemental Verified Statement*, ¶ 5.

86. *In re Pillowtex, Inc.*, 304 F.3d at 255.

87. *Supplemental Verified Statement*, ¶ 6.

existence of a creditors' committee to monitor these types of issues, satisfies the Court's concerns.

### 6. Pre–Petition Sale of BHFS's Account Receivable

 7677 listed Everest Marin as an unsecured creditor on Schedule F in the amount of $662,843.93 for "Legal fees owed to Brownstein Hyatt Farber Schreck, LLP August 6, 2009."[88] BHFS further explained this transaction in the Verified Statement as follows:

As of August 6, 2009, the Debtor owed BHFS $662,843.93 (the "Pre–Petition Debt") for fees and expenses related to legal representation on various matters. On or about August 6, 2009, BHFS, pursuant to a bill of sale, sold its receivable from the Debtor to Everest Marin, and Everest Marin is now a creditor of the Debtor with respect to this receivable. In return, Everest executed a promissory note for the amount of the receivable payable to BHF S.[89] The note is secured by a second deed of trust, security agreement, financing statement and assignment of rents and leases on the European Village. BHFS will not represent Everest Marin with respect to collection of the receivable now owed to Everest Marin by the Debtor or otherwise in this case.[90]

NexBank questions why Everest Marin would enter into such a transaction. Accordingly, it examined Davidson regarding paragraph four of the *Consent of the General Partner of Everest Marin, L.P., a Colorado Limited Partnership* (the "Consent"):

WHEREAS, the Company [Everest Marin] has determined it to be in their best interest to continue receiving the Services [BHFS's services] and BHFS has conditioned the provision of such future Services on the Company's acquisition of the accounts receivable held by BHFS in connection with the legal services rendered by BHFS on behalf of East Berry [7677][91]

Davidson testified he signed the Consent in part so Everest Marin would continue to receive the services of BHFS and in part because 7677's success will have a positive effect on the European Village development.

The transaction was described as "ingenious" by counsel for the Creditor's Committee, who did not object to BHFS's employment. NexBank, however, criticized the transaction as violating the spirit of the Bankruptcy Code and threatening the integrity of the entire bankruptcy system. Such divergent opinions leave this Court asking several questions. Was this a legitimate, original, and clever way to avoid being defined a "creditor" under § 327(a)? Was this an invalid and manipulative way to circumvent the clear requirements of the Bankruptcy Code? Does it fall somewhere in between?

There are some troubling facts regarding this transaction. First, BHFS declined to waive its pre-petition fee as is the usual course of action in this and many

---

88. *Debtors' Exhibit 3.*

89. The Promissory Note provides for payment of the entire outstanding principal balance, plus interest, "on the earlier of (i) February 8, 2010; or (ii) [Everest Marin's] receipt of (A) capital contributions from new or existing partners in an amount equal to or in excess of $1,000,000, or (B) loan proceeds from the refinance of existing indebtedness or new indebtedness in an amount equal to or in excess of $1,000,000." Debtors' Exhibit 7.

90. *Verified Statement,* ¶ 7.

91. *NexBank's Exhibit A,* ¶ 4.

districts.[92] The Court recognizes the pre-petition fees in this case are quite substantial, more so than in a typical Chapter 11 case in this District, and thus, the decision not to waive the fee is understandable. However, the effect of this transfer is that 7677 now owes a debt to Everest Marin who, as a result of the transfer, is the second largest unsecured creditor in 7677's case. Had BHFS waived its pre-petition fee, the Debtor would have less unsecured debt. On the flip side, if this transaction had not been consummated and another firm chosen to serve as Debtors' counsel, the Debtor would still owe the $662,843.93 debt to BHFS.

Second, while not precisely the same, the sale of the BHFS receivable can be equated to an entity or principal paying the post-petition fees and costs for a debtor affiliate's bankruptcy counsel, the situation analyzed in cases such as *In re EZ Links Golf, LLC*[93] and *In re Lotus Properties LP*.[94] In those cases retention of inde-pendent legal counsel by the payor party to advise them of the wisdom and legality of the proposed transaction was an important factor to be considered, and in *Lotus*, the retention of independent counsel was mandatory.[95]

Here, in connection with the sale of the receivable in question, the Bill of Sale,[96] Promissory Note,[97] and Deed of Trust[98] were drafted by BHFS and presented to Everest Marin for execution. Neither the amount of the receivable, the interest rate, nor any other term set forth in these documents was negotiated or contested by Everest Marin. The unrebutted testimony shows BHFS advised Everest Marin, through Davidson, to retain independent counsel to review the documents before signing. Davidson claims to have understood the terms and affect of the documents and thus did not need independent counsel. The Court finds Mr. Davidson is well-educated (he has a Bachelor of Sci-

---

**92.** In many cases, a professional seeking to be employed under § 327(a) is ordered, or voluntarily agrees, to waive any prepetition claim against the debtor. The Court in *Pillowtex* cited the following examples of cases in which a court denied employment absent a waiver of counsel's pre-petition fee:

> *Princeton,* 249 B.R. at 816 (noting requirement that retention be denied absent waiver); *Fulgham,* 181 B.R. at 142 ("Unless Mr. Beck waives his prepetition claim he may not be employed by the Debtor"); *Charter,* 167 B.R. at 998 (denying retention absent waiver); *Adam,* 158 B.R. at 297 (approving law firm's retainers in light of waiver); *Watervliet,* 96 B.R. at 774 (permitting retention as debtor's counsel upon waiver).

*Pillowtex,* 304 F.3d at 253. *See also In re Boot Hill Biofuels, LLC,* 2009 WL 982192 (Bankr.D.Kan. March 27, 2009) (law firm that became a "gap creditor" ordered to amend or clarify its fee disclosure or waive any claim against the estate for fees incurred in the gap period.), *In re American Home Mortg. Holdings, Inc.,* 411 B.R. 169, 172 (Bankr.D.Del. 2008) (professional agreed to waive prepetition fee of $92,847.67 in order to be employed under § 327(a)), *In re Printcrafters, Inc.,* 208 B.R. 968, 977 (Bankr.D.Colo.1997), rev'd on other grounds by *In re Printcrafters, Inc.,* 233 B.R. 113 (D.Colo.1999) ("On the eve of the bankruptcy filing many counsel draw from a retainer sufficient funds to pay all prepetition fees and expenses in order to create disinterested status. Other counsel waive the amount owed for prepetition services in order to accomplish the same objective.").

**93.** *In re EZ Links Golf, LLC,* 317 B.R. at 863.

**94.** *In re Lotus Properties LP,* 200 B.R. at 393.

**95.** *Id.* at 393 (the third test enunciated by the Court requires the third party payor/insider *must* retain independent legal counsel and must understand that the attorney's duty of undivided loyalty is owed exclusively to the debtor/client).

**96.** *Debtors' Exhibit 6.*

**97.** *Debtors' Exhibit 7.*

**98.** *Debtors' Exhibit 8.*

ence degree in corporate finance, as well as a Master of Business Administration in corporate finance) and is a sophisticated businessman (particularly in real estate), but he is not an attorney.

While the *Lotus* factors appear inflexible, this Court notes the court in the case from which the *Lotus* Court derived its test observed its list was not exhaustive, nor was every condition to be satisfied in every situation.[99] Rather the list was to serve as a guide.[100] Herein, while independent counsel is important, failure to secure such assistance by Everest Marin or Davidson is not fatal in and of itself.

Perhaps the most important factor considered by this Court in connection with this transaction is the independent ability of Everest Marin to pay the obligation it undertook with BHFS. While Everest Marin does not have any current cash flow, the uncontroverted testimony of Davidson established Everest Marin's real property assets contain equity sufficient to pay the BHFS obligation.[101] Thus, the payment of the BHFS obligation is not dependent on Everest Marin being paid anything by the Debtors in the instant bankruptcy cases.

As a result, while suspicious at first glance, for purposes of § 327(a), the transaction seems to have accomplished its goal of removing BHFS as a creditor in this case and shifting the risk of nonpayment from BHFS to Everest Marin. At present, therefore, the transaction puts BHFS in a situation wherein it is not dependent upon the success of the Debtors for payment of this obligation and thus it does not have an adverse interest to the Debtors.

## D. The Appearance of Impropriety and the Facts of this Case

The most subjective, and perhaps the most difficult, issue to address in situations of this type is the amorphous "appearance of impropriety" concept. While individual factors, in and of themselves, may not lead to a conclusion that a firm's representation of a debtor creates such an appearance, the cumulative effect of these individual factors together can paint a factual picture that leads to the inescapable conclusion that the proposed representation is inappropriate.[102]

In this case, the transaction with Everest Marin, while legal and as noted above, within the parameters of the Bankruptcy Code, creates an appearance of "gaming the system." Further, the continued representation of certain entities related to the Debtors gives rise to numerous problems. As noted by BHFS, "[p]ost-petition, BHFS will continue to represent Everest Marin … (except in respect of Everest Marin's claims or other relationships with the Debtor)."[103] There was no testimony as to the particular matters wherein BHFS would continue to represent Everest Marin. It is difficult for the Court to imagine what would be wholly separate and independent from the Debtors' business given the Project and European Village are "complimentary" developments, share office space, marketing efforts, and amenities, and that Davidson controls both

---

**99.** *In re Kelton Motors, Inc.,* 109 B.R. at 658.

**100.** *Id.*

**101.** Davidson estimated the Everest Marin real property has a value in excess of $50,000,000, subject to a first position construction loan of $17,000,000, and BHFS in second position.

**102.** *See generally In re Plumberex Specialty Products Inc.,* 311 B.R. 551, 560 (Bankr. C.D.Cal.2004); *In re Kasdorf,* 64 B.R. 294, 295 (Bankr.D.Colo.1986).

**103.** *Verified Statement,* ¶ 8.

developments. Additionally, as noted above, the "Acknowledgment of duty of loyalty" letter was signed by Davidson, on behalf of Everest Marin, without independent legal counsel.[104] If the two developments were both in the same stage of development, this Court would have been extremely hesitant to allow the employment for both the Debtors and Everest Marin to proceed without further clarification. However, because it is likely the within Chapter 11 cases will be concluded before the European Village development will be constructed, the "competition" issue appears to be a more theoretical than a present reality.

Finally, while the existence of a creditors' committee does not eliminate or minimize the duties incumbent upon debtor's counsel to investigate and pursue claims against any individual or entity which will benefit all creditors, the cooperation of such a committee with debtor's counsel may assist in identifying any situations in which special counsel should be retained for analysis or litigation purposes. This gives the Court some comfort any potential prejudice to creditors will be minimized, if not eliminated entirely.

In connection with its request to represent the three Debtors in this jointly administered case, along with its prior and current representation of certain creditors, BFHS is walking on the edge of a sword. After considering all the evidence before it and considering the arguments presented, and being mindful of the underlying premise that the debtor's choice of counsel is important, the Court will approve the retention of BHFS as counsel for the Debtors in this jointly administered case. However, if facts come to light in the future which should have been identified as part of this process and which would have resulted in a different finding, this

Court will not hesitate to revisit this employment order and any compensation rulings which it may enter in the future.

## CONCLUSION

THEREFORE, IT IS ORDERED the *Application to Employ Brownstein Hyatt Farber Schreck, LLP as Counsel for Debtor in Possession* filed by each of the three jointly administered Debtors is GRANTED.